```
              IN THE UNITED STATES DISTRICT COURT
                 EASTERN DISTRICT OF ARKANSAS
                       WESTERN DIVISION
```

PET QUARTERS, INC.                                  PLAINTIFF


V.                 CASE NO. 4:04-CV-697 (RSW)

THOMAS BADIAN, RHINO ADVISORS, INC.,
AMRO INTERNATIONAL, S.A., SPLENDID ROCK
HOLDINGS, LTD., LADENBURG THALMANN & CO., INC.,
MICHAEL VASINKEVICH, H.U. BACHOFEN,
HANS GASSNER, JAMES DAVID HASSAN,
MARKHAM HOLDINGS LIMITED, CURZON CAPITAL
CORPORATION, WESTMINSTER SECURITIES CORP.,
AND JOHN DOES 1 TO 50 INCLUSIVE,                   DEFENDANTS


## OPINION AND ORDER

### I. Introduction

Before the Court is a Motion by defendant H.U. Bachofen to dismiss for lack of personal jurisdiction (doc. #57). Plaintiff has responded and opposes the Motion.  For the reasons set forth below, the Motion is **DENIED**.

### II.  Background

Plaintiff Pet Quarters, Inc., is a corporation organized and existing under the laws of the State of Arkansas, with its principal place of business in Arkansas. Pet Quarters is an Internet supplier of pet food and other pet supplies for consumers and professionals. Pet Quarters sells its goods over the Internet and through a mail order catalog. Defendant H.U.

Bachofen is a resident of Nussbaumen, Switzerland and is a director of separate defendant, Amro, International.[1]

In early 1999, Pet Quarters began to look for capital funding sources to help aid in the growth of its business. Following a series of conversations and referrals, Pet Quarters entered into three financing arrangements with defendant Thomas Badian and his investment companies (collectively "investment agreements"). On February 23, 2000, Pet Quarters entered into a common stock and warrants purchase agreement with Amro. Under the Agreement, Pet Quarters sold shares of its common stock to Amro for a total of $1.5 million. The Agreement contained repricing provisions under which Amro could demand additional shares of stock in the event the share price fell over a defined period of time.[2] Bachofen signed the Agreement on behalf of Amro.

On March 15, 2000, Pet Quarters entered into an equity line of credit with Splendid Rock, another Badian investor. Pet Quarters could periodically draw on the line of credit in exchange for shares of common stock, issued at a discount to

---

[1]Although Bachofen refers to himself as a "director" of Amro, his authority and actions in regards to Amro are much broader than those traditionally given directors in the United States. Bachofen's authority over Amro is more consistent with an officer of a corporation than a director. The Court assumes this is more a matter of semantics than substance.

[2]This Agreement also contained an arbitration clause that read, "Any dispute under this Agreement shall be submitted to arbitration under the American Arbitration Association (the "AAA") in New York City, New York . . . ."

market price. On May 2, 2000, Pet Quarters entered into a loan agreement with Amro in the amount of $1 million. The loan was made subject to the terms and conditions of a convertible debenture, which allowed Amro to convert any outstanding principal into shares of Pet Quarters' common stock after a certain period of time. Bachofen also signed the Loan Agreement on behalf of Amro.  By March 2001, Pet Quarters' stock was trading at pennies per share, down from a high of more than six dollars on September 1, 1999.

On July 21, 2004, plaintiff filed this action against thirteen named defendants, alleging their involvement in a scheme to defraud plaintiff and to manipulate downward the price of Pet Quarters' securities in violation of federal and state laws. In general, plaintiff alleges that the defendants are seasoned practioners of a "death spiral" funding scheme in which they provide financing to a target company and proceed to aggressively short-sell its stock in the hope that such short sales will drive down the price of the target company's securities. Pet Quarters accuses defendant Bachofen of being a control person of Amro and therefore participating in the scheme to manipulate the price of Pet Quarters' stock.

The Complaint sets forth eleven claims against Bachofen: (1) violation of § 10 of the Securities Exchange Act of 1934 and SEC Rule 10b-5 (Counts I & II), (2) violation of sections 23-42-507

and 23-42-508 of the Arkansas Code Annotated (Count III), (3) common law fraud (Count IV), (4) aiding and abetting breach of fiduciary duty (Count VI), (5) prima facie tort (Count VII), (6) constructive fraud (Count IX), (7) civil conspiracy (Count XII), (8) tortious interference with contracts (Count XIII), (9) control person liability under § 20A of the Exchange Act (Count XIV), and (10) disgorgement and restitution under the Exchange Act (Count XVI). Defendant moves to dismiss the Complaint pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure for lack of personal jurisdiction. Alternatively, Bachofen moves to dismiss the Complaint for improper venue pursuant to Rules 12(b)(3) and 12(b)(6).[3]

## III. Discussion

    A.   <u>Standard of Review</u>

In order to survive a motion to dismiss for lack of personal jurisdiction, the plaintiff must make a prima facie showing that the Court has personal jurisdiction over the defendant. <u>Epps v. Stewart Info. Services Corp.</u>, 327 F.3d 642, 647 (8th Cir. 2003). The plaintiff bears the burden of proof of whether jurisdiction exists. <u>Id.</u> The Court must view the evidence in a light most favorable to the plaintiff and resolve all factual conflicts in

---

[3] In regards to the Motion to Dismiss for Improper Venue, Bachofen joins in the Memorandum of Law in support of the Motion to Dismiss filed by defendants Amro, Splendid Rock, and Rhino Advisors (doc. #56).

favor of the plaintiff. Digi-Tel Holdings, Inc. v. Proteq Telecomm., Ltd., 89 F.3d 519, 522 (8th Cir. 1996). With this standard in mind, the Court begins its analysis.

B.    Personal Jurisdiction

The plaintiff's first contention is that this Court has personal jurisdiction over defendant because he is liable as a controlling person under the Exchange Act. As support for this proposition, the plaintiff relies on San Mateo County Transit Dist. v. Dearman, Fitzgerald & Roberts, Inc., 979 F.2d 1356 (9th Cir. 1992). In that case, the court held that personal jurisdiction exists if "the plaintiff makes a non-frivolous allegation that the defendant controlled a person liable for the fraud."

Although the Eighth Circuit has not specifically ruled on this issue, this Court rejects the contention that control person liability can confer personal jurisdiction over a defendant. Control person liability and personal jurisdiction are separate issues. The broad understanding of control person liability adopted by the securities laws cannot on its own support personal jurisdiction. The Court finds the reasoning set forth in City of Monroe Employees Ret. Sys. v. Bridgestone Corp., 399 F.3d 651, 667-68 (6th Cir. 2005) to be persuasive. As the court stated,

> This approach would, . . . , "impermissibly conflate statutory liability with the Constitution's command that the exercise of personal jurisdiction must be fundamentally fair." Though they may involve a similar

5

contact-based analysis, ultimately, the two inquiries
must be distinct: "control person liability under the
securities laws is not germane to the issue of personal
jurisdiction" (internal citations omitted).

Id. (quoting In re Baan Co. Sec. Litig., 245 F. Supp. 2d 117,

128-29 (D.D.C. 2003) and FDIC v. Milken, 781 F. Supp. 226, 234

(S.D.N.Y. 1991)). Accordingly, the Court declines to address the

plaintiff's control person liability theory and will continue

with a due process-based analysis.

In determining whether to exercise personal jurisdiction

over a defendant, the Court must consider whether the exercise of

jurisdiction complies with the state long-arm statute and, if so,

whether it comports with due process. Stevens v. Redwing, 146

F.3d 538, 543 (8th Cir. 1998).[4] Because § 27 of the Exchange Act

provides federal courts with personal jurisdiction to the full

extent of the Due Process Clause, the Court only needs to

consider whether the requirements of due process are satisfied.

To satisfy the Due Process Clause, a defendant must have

sufficient "minimum contacts" with the forum state, such that

summoning the defendant to the forum state would not offend

"traditional notions of fair play and substantial justice." Int'l

Shoe Co. v. Washington, 326 U.S. 310, 316 (1945). Sufficient

minimum contacts exist when "the defendant's conduct and

---

[4]Because plaintiff's action is based on a federal statute, the
forum applicable to jurisdiction analysis is the United States
rather than a forum state.

connection with the forum State are such that he should reasonably anticipate being haled into court there." <u>World-Wide Volkswagen Corp. v. Woodson</u>, 444 U.S. 286, 297 (1980).  There must be some act by which the defendant "purposefully avails itself of the privilege of conducting activities with the forum State, thus invoking the benefits and protections of its laws." <u>Burger King Corp. v. Rudzewicz</u>, 471 U.S. 462, 475 (1985). The defendant's contacts must create a "substantial connection with the forum State." <u>Id.</u>

When determining whether a defendant has a substantial connection with a forum state, the Court must look at the following factors: (1) the nature and quality of the contacts with the forum state, (2) the quantity of the contacts with the forum state, (3) the relation of the cause of action to the contacts, (4) the interest of the forum state in providing a forum for its residents, and (5) the convenience of the parties. <u>Porter v. Berall</u>, 293 F.3d 1073, 1076 (8th Cir. 2002). The last two factors are not as important and are not determinative. <u>Id.</u>

Bachofen argues that the Court should not take into account any contacts he had with the United States while acting in a corporate capacity for Amro. This argument is known as the "fiduciary" or "corporate shield doctrine." The corporate shield doctrine provides that individuals cannot be subject to personal jurisdiction in a forum based on acts performed in a corporate

7

capacity. <u>See</u> <u>Ark. Rice Growers Coop. Ass'n v. Alchemy Indus.,</u> <u>Inc.</u>, 797 F.2d 565, 574 (8th Cir. 1986)(stating that "a corporate officer or agent who has contact with the forum state only with regard to the performance of corporate duties does not thereby become subject to jurisdiction in his or her individual capacity").

The corporate shield doctrine is a creature of state law, however, and does not apply to a constitutional due process analysis. <u>Barnett v. Kohler</u>, No. 4:05CV132GTE, 2006 WL 616805, at *2 (W.D. Ark. March 3, 2006); <u>Residential Funding Corp. v. Anvil</u> <u>Funding Corp.</u>, No. Civ. 04-3043JNESRN, 2005 WL 1323940, at *5 (D. Minn. June 3, 2005). There is no separate corporate shield doctrine that exists apart from normal 14th Amendment analysis. <u>Touchmark Corp. v. Rice</u>, 945 F. Supp. 172, 176 (E.D. Ark. 1996).

In fact, the Supreme Court explicitly rejected the corporate shield doctrine in <u>Calder v. Jones</u>, 465 U.S. 783 (1984) and <u>Keeton v. Hustler Magazine, Inc.</u>, 465 U.S. 770 (1984)(decided the same day). As the Court in <u>Keeton</u> explained, "[W]e today reject the suggestion that employees who act in their official capacity are somehow shielded from suit in their individual capacity." 465 U.S. at 781 n.13. This does not mean that jurisdiction over a company necessarily means jurisdiction over an employee. The Court must assess the defendant's contacts with the United States individually. <u>Id.</u> Because the Court's jurisdiction in the present

case is coextensive with constitutional limits, the Court rejects the corporate shield doctrine and continues to determine whether jurisdiction over the defendant comports with due process.

As to the nature, quality, and quantity of Bachofen's contacts with the United States, he argues that he has had virtually no contacts with the United States, and those that he has had are of minimal quality. He argues that his only significant contact with the United States is that he once owned an interest worth about $5,000 in a Wisconsin limited liability company. He contends that he no longer owns that interest and has never paid taxes in the United States. In his affidavit, Bachofen states that his authority with respect to Amro is very limited and that he has no ownership interest in Amro. The plaintiff argues that Bachofen's contact with the United States is much more extensive than he admits in his affidavit.

For example, SEC filings reveal Bachofen's name more than 476 times in connection with various securities transactions in more than 50 different publicly traded companies. These filings refer to Bachofen as the director and manager of Amro with investment authority over all shares held by Amro. This information means that Bachofen has executed hundreds of stock purchase agreements on behalf of Amro with United States companies. The stock purchase agreements are usually complex common stock convertible debentures. In connection with those

Agreements, Bachofen has made thousands of transactions concerning shares of common stock that Amro owns in the United States. Even though the transactions are on behalf of Amro, Bachofen has dispositive power over any shares held by Amro.[5]

Bachofen has also engaged in investment activity in the United States on behalf of BNC Bach International, Ltd. and Ultrafinance. Both companies are also involved in investing in publicly-traded United States companies and are controlled by Bachofen. In addition, Bachofen has personally filed Schedule 13G or 13D forms on behalf of Amro at least thirteen times. See In re CINAR Corp. Sec. Litig., 186 F. Supp. 2d 279, 305 (E.D.N.Y. 2002) (holding that single instance of signing a registration statement on behalf of corporation was sufficient to confer personal jurisdiction over general counsel).

This "continuous and systematic" contact by Bachofen with the United States is a clear example of a defendant purposefully availing himself of the privilege of doing business in the United States. Bachofen's contacts are not "random, fortuitous, or attenuated." Given the sheer quantity of agreements Bachofen executed on behalf of Amro, he should have reasonably foreseen

_____

[5]For example, a Schedule 13D form filed by Universal Communications Systems, Inc., states, "H.U. Bachofen and Michael Klee are the directors of Amro and share voting and dispositive power over the shares of Common Stock held by Amro." This is just one of many SEC filings that indicates the power that Bachofen held over Amro's shares.

that if there was to be litigation concerning any of the stock agreements, he would be hauled into court in the United States. Bachofen has a substantial connection with the United States, making the exercise of jurisdiction reasonable.

The relation of Bachofen's contacts with the present cause of action also supports the exercise of jurisdiction. Bachofen signed the Common Stock and Warrants Purchase Agreement and the May 2nd Loan Agreement on behalf of Amro. These Agreements are an integral piece of the manipulation alleged by the plaintiff. Accordingly, the present cause of action partly arose out of Bachofen's contact with the forum. See Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414 (1984)(stating, "When a controversy is related to or 'arises out of' a defendant's contacts with the forum, the Court has said that a 'relationship among the defendant, the forum, and the litigation' is the essential foundation of in personam jurisdiction)(quoting Shaffer v. Heitner, 433 U.S. 186, 204 (1977)).

Given the nature, quality, and the connection of Bachofen's contacts with the cause of action, the Court concludes that Bachofen's contacts with the United States support the exercise of personal jurisdiction.[6]

C.    Arbitration

In the alternative, Bachofen moves to dismiss the complaint

---

[6]The Court declines to address the last two factors, finding them to not be dispositive.

for improper venue, pursuant to Rules 12(b)(3) and 12(b)(6) of the Federal Rules of Civil Procedure. Bachofen joins in the Memorandum of Law in support of the Motion to Dismiss filed by defendants Amro, Splendid Rock, and Rhino Advisors.

For the reasons stated in the Opinion and Order entered May 9, 2006, (doc. #162), the Court concludes that Pet Quarters' claims against Bachofen are subject to the mandatory arbitration clause contained in the Common Stock and Warrants Purchase Agreement signed by Bachofen on behalf of Amro. An officer or director of a corporation, such as Bachofen, that is a party to an arbitration agreement is "closely related" to the disputes arising out of the agreement and may enforce any arbitration clause. <u>Marano Enterprises of Kan. v. Z-Teca Restaurants, L.P.</u>, 254 F.3d 753, 757 (8th Cir. 2001). Accordingly, all claims against Bachofen are stayed pending arbitration in New York.

**IV.   Conclusion**

For the reasons stated above, defendant Bachofen's Motion to Dismiss for lack of personal jurisdiction (doc. #57) is **DENIED**. However, all claims against Bachofen are stayed pending arbitration in New York. Plaintiff's requests for jurisdictional discovery and for more time to fully respond are **DENIED AS MOOT**.

On April 5, 2006, counsel for Bachofen filed a Suggestion of Death Upon the Record (doc. #155). No party has filed a proper motion for substitution of parties. Unless a motion for substitution is made within 90 days after the Suggestion of Death

was properly filed and served, the Court will dismiss the cause of action against Bachofen without further notice to either party. Fed. R. Civ. P. 25(a)(1).

**IT IS SO ORDERED**, this 24th day of May, 2006.

RODNEY S. WEBB  District Judge
United States District Court