```
          IN THE UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF ARKANSAS
                    WESTERN DIVISION
```

PET QUARTERS, INC.                                              PLAINTIFF


V.                    CASE NO. 4:04-CV-697 (RSW)

THOMAS BADIAN, RHINO ADVISORS, INC.,
AMRO INTERNATIONAL, S.A., SPLENDID ROCK
HOLDINGS, LTD., LADENBURG THALMANN & CO., INC.,
MICHAEL VASINKEVICH, H.U. BACHOFEN,
HANS GASSNER, JAMES DAVID HASSAN,
MARKHAM HOLDINGS LIMITED, CURZON CAPITAL
CORPORATION, WESTMINSTER SECURITIES CORP.,
AND JOHN DOES 1 TO 50 INCLUSIVE,                               DEFENDANTS


## OPINION AND ORDER

**I. Introduction**

Before the Court is a Motion by defendant Hans Gassner to Dismiss the Complaint or, in the Alternative, to Transfer Based Upon Improper Venue (doc. #137). Plaintiff has responded and opposes the Motion. For the reasons set forth below, the Motion is **DENIED IN PART**.

**II. Background**

Plaintiff Pet Quarters, Inc., is a corporation organized and existing under the laws of the State of Arkansas, with its principal place of business in Arkansas. Pet Quarters supplies pet food and other pet supplies to consumers and professionals through the Internet and mail order catalogs. Defendant Hans

1

Gassner is a resident of Liechtenstein, Germany, and is Director of separate defendant, Splendid Rock Holdings, Ltd. ("Splendid Rock").[1]

In early 1999, Pet Quarters began to look for capital funding sources to help aid in the growth of its business.[2] During this search, Pet Quarters was introduced to defendant Ladenburg Thalmann and Company, a capital investment firm. Following a series of conversations and referrals, Ladenburg introduced Pet Quarters to defendant Thomas Badian. Pet Quarters eventually entered into three financing arrangements with Badian and his investment companies.

On February 23, 2000, Pet Quarters entered into a common stock and warrants purchase agreement with Amro International ("Amro") and Markham Holdings Limited ("Markham"), both Badian investors. Under the Agreement, Pet Quarters sold 619,047 shares of its common stock to Amro and 95,238 shares to Markham, for a total of less than $1.5 million. The Agreement contained repricing provisions under which Amro and Markham could demand additional shares of stock in the event the share price fell over

---

[1] Although Gassner refers to himself as a "director" of Splendid Rock, his authority and actions in regards to Splendid Rock are much broader than those traditionally given directors in the United States. Gassner's authority over Splendid Rock is more consistent with an officer of a corporation than a director. The Court assumes this is more a matter of semantics than substance.

[2] At the time, Pet Quarters' stock traded on the Over-the-Counter Bulletin Board ("OTCBB").

a defined period of time.

On March 15, 2000, Pet Quarters entered into an equity line of credit with Splendid Rock, another Badian investor. Pet Quarters could periodically draw on the line of credit in exchange for shares of common stock, issued at a discount to market price. Gassner signed the equity line of credit on behalf of Splendid Rock.[3]

On May 2, 2000, Pet Quarters entered into a loan agreement with Amro in the amount of $1 million. The loan was made subject to the terms and conditions of a convertible debenture, which allowed Amro to convert any outstanding principal into shares of Pet Quarters' common stock after a certain period of time. By March 2001, Pet Quarters' stock was trading at pennies per share, down from a high of more than six dollars on September 1, 1999.

On July 21, 2004, plaintiff filed this action against thirteen named defendants, alleging their involvement in a scheme to defraud plaintiff and to manipulate downward the price of Pet Quarters' securities in violation of federal and state laws. In general, plaintiff alleges that the defendants are seasoned practioners of a "death spiral" funding scheme in which they provide financing to a target company and proceed to aggressively short-sell its stock in the hope that such short sales will drive

---

[3]The Common Stock and Warrants Purchase Agreement and the Equity Line of Credit also contained a mandatory arbitration clause.

down the price of the target company's securities. Pet Quarters alleges that Gassner is involved in this "death spiral" scheme because he is a control person of Splendid Rock and therefore participated in the scheme to manipulate the price of Pet Quarters' stock.

The Complaint sets forth eleven claims against Gassner: (1) violation of § 10 of the Securities Exchange Act of 1934 and SEC Rule 10b-5 (Counts I & II), (2) violation of sections 23-42-507 and 23-42-508 of the Arkansas Code Annotated (Count III), (3) common law fraud (Count IV), (4) aiding and abetting breach of fiduciary duty (Count VI), (5) prima facie tort (Count VII), (6) constructive fraud (Count IX), (7) civil conspiracy (Count XII), (8) tortious interference with contracts (Count XIII), (9) control person liability under § 20A of the Exchange Act (Count XIV), and (10) disgorgement and restitution under the Exchange Act (Count XVI). Defendant moves to dismiss the Complaint pursuant to Rules 9(b), 12(b)(1), 12(b)(2), 12(b)(3), and 12(b)(6) of the Federal Rules of Civil Procedure.[4]  Defendant also moves to dismiss the Complaint for failure to plead with particularity under the Private Securities Litigation Reform Act, 15 U.S.C. § 78-u4 ("PSLRA"). The Court will address each of the

---

[4]In regards to the Motion to Dismiss for Improper Venue, Gassner joins in the Memorandum of Law in support of the Motion to Dismiss filed by defendants Amro, Splendid Rock, and Rhino Advisors (doc. #56).

defendant's contentions in turn.

**III. Discussion**

    A.   <u>Personal Jurisdiction</u>

The defendant's first possible ground for dismissal is that this Court does not have personal jurisdiction over Gassner. In order to survive a motion to dismiss for lack of personal jurisdiction, the plaintiff must make a prima facie showing that the Court has personal jurisdiction over the defendant. <u>Epps v. Stewart Info. Services Corp.</u>, 327 F.3d 642, 647 (8th Cir. 2003). The plaintiff bears the burden of proof of whether jurisdiction exists. <u>Id.</u> The Court must view the evidence in a light most favorable to the plaintiff and resolve all factual conflicts in favor of the plaintiff. <u>Digi-Tel Holdings, Inc. v. Proteq Telecomm., Ltd.</u>, 89 F.3d 519, 522 (8th Cir. 1996). With this standard in mind, the Court begins its analysis.

The plaintiff's first contention is that this Court has personal jurisdiction over defendant because he is liable as a controlling person under the Exchange Act.[5] As support for this proposition, the plaintiff relies on <u>San Mateo County Transit Dist. v. Dearman, Fitzgerald & Roberts, Inc.</u>, 979 F.2d 1356 (9th Cir. 1992). In that case, the court held that personal jurisdiction exists if "the plaintiff makes a non-frivolous

---

[5]The Court previously rejected this argument in its Opinion and Order dated May 25, 2006 (doc. #167), but will repeat its reasoning here.

5

allegation that the defendant controlled a person liable for the fraud."

Although the Eighth Circuit has not specifically ruled on this issue, this Court rejects the contention that control person liability can confer personal jurisdiction over a defendant. Control person liability and personal jurisdiction are separate issues. The broad understanding of control person liability adopted by the securities laws cannot on its own support personal jurisdiction. The Court finds the reasoning set forth in <u>City of Monroe Employees Ret. Sys. v. Bridgestone Corp.</u>, 399 F.3d 651, 667-68 (6th Cir. 2005) to be persuasive. As the court stated,

> This approach would, . . . , "impermissibly conflate statutory liability with the Constitution's command that the exercise of personal jurisdiction must be fundamentally fair." Though they may involve a similar contact-based analysis, ultimately, the two inquiries must be distinct: "control person liability under the securities laws is not germane to the issue of personal jurisdiction" (internal citations omitted).

<u>Id.</u> (quoting <u>In re Baan Co. Sec. Litig.</u>, 245 F. Supp. 2d 117, 128-29 (D.D.C. 2003) and <u>FDIC v. Milken</u>, 781 F. Supp. 226, 234 (S.D.N.Y. 1991)). Accordingly, the Court declines to address the plaintiff's control person liability theory and will continue with a due process-based analysis.

In determining whether to exercise personal jurisdiction over a defendant, the Court must consider whether the exercise of jurisdiction complies with the state long-arm statute and, if so, whether it comports with due process. <u>Stevens v. Redwing</u>, 146

F.3d 538, 543 (8th Cir. 1998).[6] Because § 27 of the Exchange Act provides federal courts with personal jurisdiction to the full extent of the Due Process Clause, the Court only needs to consider whether the requirements of due process are satisfied.

To satisfy the Due Process Clause, a defendant must have sufficient "minimum contacts" with the forum state, such that summoning the defendant to the forum state would not offend "traditional notions of fair play and substantial justice." Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945). Sufficient minimum contacts exist when "the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980). There must be some act by which the defendant "purposefully avails itself of the privilege of conducting activities with the forum State, thus invoking the benefits and protections of its laws." Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475 (1985). The defendant's contacts must create a "substantial connection with the forum State." Id.

When determining whether a defendant has a substantial connection with a forum state, the Court must look at the following factors: (1) the nature and quality of the contacts

---

[6] Because plaintiff's action is based on a federal statute, the forum applicable to jurisdiction analysis is the United States rather than a forum state.

with the forum state, (2) the quantity of the contacts with the forum state, (3) the relation of the cause of action to the contacts, (4) the interest of the forum state in providing a forum for its residents, and (5) the convenience of the parties. Porter v. Berall, 293 F.3d 1073, 1076 (8th Cir. 2002). The last two factors are not as important and are not determinative. Id.

    Gassner argues that the Court should not take into account any contacts he had with the United States while acting in a corporate capacity for Splendid Rock. This argument is known as the "fiduciary" or "corporate shield doctrine." The corporate shield doctrine provides that individuals cannot be subject to personal jurisdiction in a forum based on acts performed in a corporate capacity. See Ark. Rice Growers Coop. Ass'n v. Alchemy Indus., Inc., 797 F.2d 565, 574 (8th Cir. 1986)(stating that "a corporate officer or agent who has contact with the forum state only with regard to the performance of corporate duties does not thereby become subject to jurisdiction in his or her individual capacity").

    The Court rejects this contention. The corporate shield doctrine is a creature of state law and does not apply to a constitutional due process analysis. Barnett v. Kohler, No. 4:05CV132GTE, 2006 WL 616805, at *2 (W.D. Ark. March 3, 2006); Residential Funding Corp. v. Anvil Funding Corp., No. Civ. 04-3043JNESRN, 2005 WL 1323940, at *5 (D. Minn. June 3, 2005). There

is no separate corporate shield doctrine that exists apart from normal 14th Amendment analysis. <u>Touchmark Corp. v. Rice</u>, 945 F. Supp. 172, 176 (E.D. Ark. 1996). In fact, the Supreme Court explicitly rejected the corporate shield doctrine in <u>Calder v. Jones</u>, 465 U.S. 783 (1984) and <u>Keeton v. Hustler Magazine, Inc.</u>, 465 U.S. 770 (1984)(decided the same day). As the Court in <u>Keeton</u> explained, "[W]e today reject the suggestion that employees who act in their official capacity are somehow shielded from suit in their individual capacity." 465 U.S. at 781 n.13.

This does not mean that jurisdiction over a company necessarily means jurisdiction over an employee. The Court must assess the defendant's contacts with the United States individually. <u>Id.</u> Because the Court's jurisdiction in the present case is coextensive with constitutional limits, the Court rejects the corporate shield doctrine and continues to determine whether jurisdiction over the defendant comports with due process.

As to the nature, quality, and quantity of Gassner's contacts with the United States, he argues that he has had virtually no contacts with the United States, and those that he has had are of minimal quality. Gassner argues that his authority with respect to Splendid Rock is very limited and that he has no ownership interest in Splendid Rock. He further argues that he never communicated or negotiated with Pet Quarters regarding the Equity Agreement; he merely signed the Agreement on behalf of

Splendid Rock. The plaintiff argues that Gassner's contact with the United States is much more extensive than he admits.

For example, SEC filings reveal that Gassner is, or has been, a director of dozens of British Virgin Island corporations that have made investments in publicly traded United States companies. This information means that Gassner has executed dozens, if not hundreds, of stock purchase agreements on behalf of various foreign corporations with United States companies. These agreements are complicated equity transactions, many with the same financing features as the Agreement between Pet Quarters and Splendid Rock. In connection with those Agreements, Gassner has made hundreds of transactions concerning shares of common stock that companies that he represents own in the United States. Even though the transactions are on behalf of corporations, Gassner has personally signed off on these agreements as director and authorized signatory. See In re CINAR Corp. Sec. Litig., 186 F. Supp. 2d 279, 305 (E.D.N.Y. 2002) (holding that single instance of signing a registration statement on behalf of corporation was sufficient to confer personal jurisdiction over general counsel).

This "continuous and systematic" contact by Gassner with the United States is a clear example of a defendant purposefully availing himself of the privilege of doing business in the United States. Gassner's contacts are not "random, fortuitous, or

attenuated." Given the quantity and complexity of agreements Gassner executed on behalf of corporations he represents, he should have reasonably foreseen that if there was to be litigation concerning any of the stock agreements, he would be hauled into court in the United States. Gassner has a substantial connection with the United States, making the exercise of jurisdiction reasonable.

The relation of Gassner's contacts with the present cause of action also supports the exercise of jurisdiction. Gassner signed the Equity Line of Credit on behalf of Splendid Rock. This Agreement is an integral piece of the manipulation alleged by the plaintiff. Accordingly, the present cause of action partly arose out of Gassner's contact with the forum. See Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414 (1984)(stating, "When a controversy is related to or 'arises out of' a defendant's contacts with the forum, the Court has said that a 'relationship among the defendant, the forum, and the litigation' is the essential foundation of in personam jurisdiction")(quoting Shaffer v. Heitner, 433 U.S. 186, 204 (1977)).[7]

Given the nature, quality, and the connection of Gassner's

---

[7] In addition, the Equity Line of Credit contained an arbitration and forum selection clause, choosing New York as the proper forum. Gassner cannot purposely avail himself of the protections and privileges of the arbitration laws of the United States and not reasonably foresee that he could be hauled into Court in that forum.

11

contacts with the cause of action, the plaintiff has made a prima facie showing that the Court has jurisdiction over defendant Gassner. Accordingly, the Court concludes that Gassner's contacts with the United States support the exercise of personal jurisdiction.[8]

    C.   <u>Arbitration</u>

Gassner's second possible ground for dismissal is that plaintiff has failed to state a claim upon which relief can be granted. If the Court denies all or any part of that requested relief, then Gassner joins in the Motion of Splendid Rock to dismiss the Complaint based upon the arbitration clause located in the Equity Line of Credit Agreement.

As stated earlier, Pet Quarters and Splendid Rock are parties to the equity line of credit agreement, which was signed by Gassner on behalf of Splendid Rock. This Agreement contains a mandatory arbitration clause that reads, "Any dispute under this Agreement shall be submitted to arbitration under the American Arbitration Association (the "AAA") in New York City, New York . . . ."

In an Order dated May 9, 2006, the Court ruled that all of plaintiff's claims against Splendid Rock fell within the scope of the mandatory arbitration clause (doc. #162). Accordingly, the Court stayed all litigation concerning Splendid Rock until the

---

[8]The Court declines to address the last two factors, finding them not to be dispositive.

arbitration contracted for by the parties is complete.

The Court's reasoning contained in its May 9, 2006 Order applies to all of Pet Quarters' claims against Gassner as well. See <u>Marano Enterprises of Kan. v. Z-Teca Restaurants, L.P.</u>, 254 F.3d 753, 757 (8th Cir. 2001)(holding that an officer or director of a corporation, such as Gassner, that is a party to an arbitration agreement is "closely related" to the disputes arising out of the agreement and may enforce any arbitration clause). Accordingly, Gassner has the right to stay litigation in the present action pending arbitration of Pet Quarters' claims against him.

However, a party entitled to arbitration can waive that right and allow the dispute to proceed in court. See <u>Kelly v. Golden</u>, 352 F.3d 344, 349 (8th Cir. 2003)(holding that a party has waived its right to arbitration if it "(1) knew of an existing right to arbitration; (2) acted inconsistently with that right; and (3) prejudiced the other party by these inconsistent acts"). Nevertheless, this Court will not allow a party to forum shop by asking the Court to examine the merits of a claim and then, if displeased with the result, demand arbitration. See <u>Kayne v. Painewebber, Inc.</u>, 684 F. Supp. 978, 981 (N.D. Ill. 1988)(stating that "although a defendant is entitled to protect his interests by moving to dismiss any arguably non-arbitrable claims, he generally may not 'forum-shop' by first asking a court to examine the merits of his claims and then, if displeased with

13

the result, demanding that the court send them to an arbitrator").

With these two rules in mind and in the spirit of judicial economy, the Court has a question for the parties involved in this Motion: do you want the Court to stay litigation between the parties pending the completion of arbitration in New York, or do you want the Court to proceed with the pending Motion to Dismiss and examine the merits of plaintiff's claims?

The parties to this Motion must instruct the Court how they would like to proceed within ten days from the date of this Order, excluding weekends and holidays. The Court would appreciate the parties' cooperation in this matter.

**IV.   Conclusion**

For the reasons stated above, defendant Gassner's Motion to Dismiss is **DENIED IN PART**. Plaintiff's requests for jurisdictional discovery and for more time to fully respond are **DENIED AS MOOT**. However, the Court will not rule on defendant's other grounds for dismissal without a clear waiver of his right to proceed to arbitration. The parties are instructed to respond to the Court as outlined above.

**IT IS SO ORDERED**, this 7th day of August, 2006.

*/s/ Rodney S. Webb*
RODNEY S. WEBB  District Judge
United States District Court

Case 4:04-cv-00697-BRW   Document 187   Filed 08/07/06   Page 15 of 15

15